CASE NO. 24-12272-A

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

MICHAEL ROSS KANE,
*Defendant/Appellant,*

v.

UNITED STATES OF AMERICA,
*Plaintiff/Appellee.*

---

Appeal from the United States District Court
for the Southern District of Florida
CASE NO. 1:23-CR-20172-KMW

---

## APPELLANT MICHAEL ROSS KANE'S OPENING BRIEF

---

<div style="margin-left:50%">

O'DONNELL CHRISTOPHER LLP
Attorney for Appellant
P.O. Box 172538
Miami, FL 33017
Tel: 305.640.8958
Email: sodonnell@
odonnellchristopher.com

*/s/ Sonia E. O'Donnell*
SONIA E. O'DONNELL
Florida Bar No. 250643

*/s/ Robert A. O'Donnell*
ROBERT A. O'DONNELL
Florida Bar No. 101156

</div>

THIS CASE IS ENTITLED TO PREFERENCE
(CRIMINAL APPEAL)

***Michael Ross Kane v. United States, Case No. 24-12272-A***

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT PURSUANT TO FEDERAL RULE OF APPELLATE PROCEDURE 26.1 <u>AND 11TH CIR. R. 26.1-1</u>**

Appellant Michael Ross Kane, by and through undersigned court-appointed counsel, and pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Local Rule 26.1-1, hereby certifies that the following persons or entities may have an interest in the outcome of this case.

Argentieri, Nicole M.

Becerra, Hon. Jacqueline

Charest-Turken, Gabrielle Raemy

Damian, Hon. Melissa

Goodman, Hon. Jonathan

Hampton, Shane

Llanes, Barbara Ratchel

McDonald, Ian

Miller, Lisa H.

Morales, Eric E.

O'Donnell Christopher LLP

**_Michael Ross Kane v. United States, Case No. 24-12272-A_**
**Certificate of Interested Persons (Cont'd)**

O'Donnell, Robert A.

O'Donnell, Sonia E.

Otazo-Reyes, Hon. Alicia M.

Reboso, Manolo

Reid, Hon. Lisette M.

Sanchez, Eduardo I.

Sanders, Jeremy R.

Seitz, Hon. Patricia A.

Sundby, Christopher Scott

Torres, Hon. Edwin G.

Walsh, Daniel Robert

Wolvaardt, George

_Sonia E. O'Donnell_
Sonia E. O'Donnell

**STATEMENT REGARDING ORAL ARGUMENT**

Appellant believes that oral argument would be helpful to the Court. The case involves a complex set of technical financial facts, as well as complicated issues concerning Appellant's sentencing enhancements; oral argument may help resolve many of the complexities.

# TABLE OF CONTENTS

**Page**

Certificate of Interested Persons and Corporate Disclosure Statement............................................................................C-1

Statement Regarding Oral Argument..........................................i

Table of Contents....................................................................ii

Table of Citations....................................................................v

Statement of Jurisdiction..........................................................x

Statement of the Issues............................................................1

Statement of the Case..............................................................2

Statement of Facts..................................................................4

Standard of Review..................................................................7

Summary of the Argument.........................................................7

Argument.............................................................................11

  I.     THE INDICTMENT DID NOT STATE A BASIS FOR APPELLANT'S CONVICTION AND SENTENCE...............11

        A.    The Government Failed To Establish That HYDRO Constituted a Security .......................14

            1.    The Government Failed To Demonstrate a Common Enterprise That Satisfies The *Howey* Test............................................15

**TABLE OF CONTENTS (Cont'd)**

**Page**

2.    The Government Failed To Demonstrate a Reasonable Expectation Of Profit From Others' Work To Satisfy The *Howey* Test...................21

3.    Where The Hydro Coins Were Not Purchased, The Government Failed To Demonstrate The Investment Requirement Of The First Prong Of The *Howey* Test..........................................28

B.    The District Court's Erroneous Treatment Of HYDRO As a Security Violates The Rule Of Lenity................................................................28

II.    THE WIRE FRAUD CHARGES RELY ON THE ERRONEOUS SECURITY FRAUD CHARGE IN COUNT ONE AND FAIL TO STATE A CRIME.............................30

A.   Legal Framework For Dependent Criminal Counts

1.    The Derivative Nature Of Wire Fraud Based On Securities Fraud ..................................30

III.    ERRONEOUS APPLICATION OF SENTENCING ENHANCEMENTS..................................................35

A.    Erroneous Sophisticated Means Enhancement......36

B.    Erroneous Leadership Enhancement....................39

C.    Erroneous Obstruction of Justice Enhancement...41

1.    Legal Standard..........................................41

2.    Appellant Lacked The Specific Intent To Obstruct a Criminal Investigation................43

iii

**TABLE OF CONTENTS (Cont'd)**

**Page**

3.      Appellant's Conduct Did Not Materially Hinder The Criminal Investigation Or Prosecution....44

IV.      ERRORS IN LOSS CALCULATION REQUIRE CORRECTIONS..........................................................46

A.      Speculative Losses Are Impermissible .................47

B.      Lack Of Proof Of Investor Reliance......................50

C.      Offsetting Gains Must Be Considered....................52

D.      The Government's Justification For Using Gain Instead Of Loss Is Legally Flawed........................52

Conclusion.............................................................................57

Certificate of Compliance.......................................................58

Certificate of Service..............................................................59

## TABLES OF CITATIONS

**Cases:**                                                                                          **Page**

*Blackledge v. Perry,*
417 U.S. 21 (1974)..............................................................................12

*Class v. United States,*
138 S.Ct. 798 (2018)..........................................................................11

*First Options of Chicago, Inc. v. Kaplan,*
115 S.Ct. 1920 (1995)...........................................................................7

*Loper Bright Enterprises v. Raimond,*
144 S.Ct. 2244 (2025)........................................................................53

*Maxwell v. United States,*
579 F.3d 1282 (11th Cir. 2009)..........................................................49

*McBoyle v. United States,*
283 U.S. 25, 27 (1931).......................................................................29

*Menna v. New York,*
423 U.S. 61 (1975)............................................................................12

*SEC v. C.M. Joiner Leasing Corp,*
320 U.S. 344 (1943)...........................................................................26

*SEC v. Friendly Power Co. LLC,*
49 F. Supp. 2d 1363 (S.D. Fla. 1999)................................................14

*SEC v. Koscot Interplanetary, Inc.,*
497 F.2d 473 (5th Cir. 1974)..............................................................16

*SEC v. Merchant Capital, LLC,*
483 F3d 747 (11th Cir. 2007) ...........................................................14

*SEC v. Ripple Labs, Inc,*
682 F.Supp. 3d 308 (S.D.N.Y. 2024) .........................................25, 26

## TABLE OF CITATIONS (Cont'd)

**Cases:**                                                              **Page**

*SEC v. Unique Fin. Concepts, Inc.*,
196 F.3d 1195 (11th Cir. 1999)........................................................7

*SEC v. W.J. Howey Co.*,
328 U.S. 293 (1946)............................................1, 2, 7, 8, 13, passim

*United Hous. Found., Inc. v. Forman*,
421 U.S. 837 (1975)...............................................................15, 21

*United States v. Banks,*
347 F.3d 1266 (11th Cir. 2003) ....................................................42

*United States v. Barner,*
572 F.3d 1239 (11th Cir. 2009) .................................................7, 42

*United States v. Bazantes,*
978 F.3d 1227 (11th Cir. 2020)....................................................55

*United States v. Bracciale,*
374 F.3d 998 (11th Cir. 2004).....................................................54

*United States v. Dupree,*
57 F.4th 1269 (11th Cir. 2023).........................................52, 53, 54

*United States v. Gradwell,*
243 U.S. 476, 37 S.Ct. 407 (1917).................................................28

*United States v. Grant,*
211 F. App'x 889 (11th Cir. 2006)..................................................51

*United States v. Guevara,*
894 F.3d 1301 (11th Cir. 2018).........................................42, 43, 44

*United States v. Horn,*
129 F.4th 1275 (11th Cir. 2025).....................................................56

vi

# TABLE OF CITATIONS (Cont'd)

**Cases:**                                                              **Pages**

*United States v. Howard,*
782 F. App'x 746 (11th Cir. 2019)..............................................45

*United States v. Jeune,*
No. 19-13018, 2021 WL 3716406 (11th Cir. Aug. 23, 2021)............44

*United States v. Moran,*
778 F.3d 942 (11th Cir. 2015).....................................................36

*United States v. Perkins,*
787 F.3d 1329 (11th Cir. 2015)................................................7, 41

*United States v. Peter,*
310 F.3d 709 (11th Cir. 2002)...............................................12, 13

*United States v. Renick,*
273 F.3d 1009 (11th Cir. 2001)......................................46, 51, 55

*United States v. Rutgard,*
116 F.3d 1270 (9th Cir. 1997)....................................................46

*United States v. Santos,*
553 U.S. 507 (2008)............................................................28, 29

*United States v. Schneider,*
930 F.2d 555 (7th Cir. 1991).....................................................46

*United States v. Sepulveda,*
115 F.3d 882 (11th Cir. 1997)....................................................48

## TABLE OF CITATIONS (Cont'd)

**Cases:**                                                                    **Page**

*United States v. Shriver,*
967 F.2d 572 (11th Cir. 1992)........................................................45

*United States v. Smith,*
2025 WL 900016 (11th Cir. Mar. 24, 2025)..................................54

*United States v. Stein,*
846 F.3d 1135 (11th Cir.),
*cert. denied,* 583 US 1039, 138 S.Ct. 556 (2017).........47, 48, 50, 55

*United States v. St. Hubert,*
909 F.3d 335 (11th Cir. 2018)...................................................7, 12

*United States v. Takhalov,*
827 F.3d 1307 (11th Cir. 2016)....................................................31

*United States v. Tatum,*
138 F.3d 1344 (11th Cir. 1998)....................................................55

*United States v. Valenzuela,*
635 F. App'x 582 (11th Cir. 2015)................................................39

*Villeneuve v. Advanced Business Concepts Corp.,*
698 F.2d 1121 (11th Cir. 1983), aff'd en banc,
730 F.2d 1403 (11th Cir. 1984).............................................15, 22

STATUTES & OTHER AUTHORITIES:

15 U.S.C. § 78(i)(a)(1)(2)...............................................................2

15 U.S.C. § 2..................................................................................2

18 U.S.C. § 371..............................................................................2

**STATUTES & OTHER AUTHORITIES:**

**Page**

18 U.S.C. § 1343.....................................................................2, 30, 31

18 U.S.C. § 1349..........................................................................2

18 U.S.C. § 3742..........................................................................x

28 U.S.C. § 1291..........................................................................x

U.S.S.G. App. C, Amend. 792 (2015).............................................36

U.S.S.G. § 2B1.1.......................................1, 35, 36, 38, 47, passim

U.S.S.G. § 3B1.1(a)..........................................................1, 36, 39

U.S.S.G. § 3C1.1...........................................................1, 36, 41, 42

Eleventh Circuit Rule 28-1...........................................................58

F.R.A.P. 32................................................................................58

## <u>STATEMENT OF JURISDICTION</u>

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, which give the courts of appeals jurisdiction over the final judgment of the United States District Court. The notice of appeal was timely filed on July 12, 2024 (Doc. 208), from the final judgment and sentence entered on July 1, 2024 (Doc. 201).

## STATEMENT OF THE ISSUES

1. Whether the district court erred in accepting a plea that required the HYDRO token be found to constitute a "security" under the test set forth in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), where the token was created and used as a utility token within an open-source financial technology ecosystem and lacked the attributes of an investment contract and, therefore, whether the indictment failed to state a crime and the plea to a non-existent crime must be vacated.

2. Whether the government's failure to show that the HYDRO token satisfied the prongs of the *Howey* test required dismissal of the securities fraud count (Count 1) since that rendered the plea to that count void for failure of the indictment to charge a crime.

3. Whether the wire fraud counts (Counts 2-4) also should have been dismissed because they were predicated entirely on the government's erroneous securities fraud theory and failed for want of an underlying fraudulent scheme which did not charge a crime.

4. Whether the district court erred in applying sentencing enhancements for "sophisticated means" under U.S.S.G. § 2B1.1(b)(10) and for a "leadership role" under U.S.S.G. § 3B1.1(a), where the record contains no evidence that Appellant Kane engaged in, or directed, complex fraudulent conduct or exercised any level of control over a fraudulent enterprise.

5. Whether the district court erred in applying sentencing enhancements for obstruction under U.S.S.G. § 3C1.1, where the record contains no evidence that Appellant knew about, or in any way affected the government's case against him.

6. Whether the district court's loss calculation was erroneous for numerous reasons including that it relied on speculative estimates, failed to demonstrate investor reliance, ignored offsetting gains, disregarded the expert calculation showing actual loss, and erroneously used Guidelines Commentary as an independent basis

1

to impose a gain-based enhancement where the text of the applicable guideline does not authorize such an enhancement.

## STATEMENT OF THE CASE

## Course of Proceedings and Disposition in the Court Below

On April 20, 2023, a federal grand jury indicted Appellant Michael Ross Kane and co-defendant Shane Hampton (Doc. 3) in a four-count indictment charging the Defendants with conspiracy to commit offenses against the United States in violation of 18 U.S.C. § 371 through violations of 15 U.S.C. § 78(i)(a)(1) and (2); conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349; and two counts of wire fraud in violation of 18 U.S.C. § 1343 and 2(a). The charges involved the crypto asset HYDRO, a crypto coin utility token (Doc. 53, Page 2). Appellant co-founded and worked for The Hydrogen Technology Corporation ("Hydrogen" or "Hydrogen Technology"), a financial company that had, among many of its projects, developed a utility token to facilitate developers' access and use of the company's platforms (Doc. 53, Page 1).

Appellant challenged the legal basis of the charges in a motion to dismiss, arguing that HYDRO did not qualify as a security under the *Howey* test because it functioned as a utility token, not an

2

investment vehicle (Doc. 53, Pages 14-29). The motion asserted that there was no common enterprise, as HYDRO holders were not reliant on Hydrogen Technology's success, and no reasonable expectation of profit derived from the company's efforts. The motion highlighted regulatory uncertainty at the time, emphasizing that SEC guidance on digital assets was issued after the alleged conduct (Doc. 53, Page 3). The motion contended that the use of a market maker was a legitimate business practice, not an effort to manipulate prices, (Doc. 53, Page 10), and that the indictment failed to state a securities offense because it relied on a vague and overly broad definition of an "investment contract." Appellant Kane requested a change of plea (Doc. 63). The motion to dismiss was denied on November 30, 2023 (Doc. 68).

On November 30, 2024, Appellant Kane pled guilty to all counts (Doc. 69, Pages 5, 18-19). A draft Pre-sentence Investigation Report ("PSR") was filed on February 14, 2024 (Doc. 129), and a Final Addendum was filed on April 3, 2024 (Doc. 157).

On May 3, 2024, June 21, and June 24 (Doc. 175, 191, 196), the trial court held sentencing hearings for Appellant Kane. On June 25, 2025, the U.S. Probation Office submitted a revised PSI (Doc.

3

194), after which the trial court entered judgment on July 1, 2024, sentencing Appellant Kane to 45 months, 3 years supervised release, and a $400.00 assessment (Doc. 201). Kane timely filed a Notice of Appeal on July 12, 2024 (Doc. 208).

**Appellant Kane is presently incarcerated.**

## STATEMENT OF FACTS

### I. Procedural Background

Appellant Michael Kane was indicted on April 20, 2023, in the Southern District of Florida and charged with one count of conspiracy to commit securities price manipulation, one count of conspiracy to commit wire fraud, and two substantive counts of wire fraud (Doc. 3; see also, Doc. 166, Page 1.) The charges stemmed from Kane's alleged involvement in what the government perceived was an attempt to inflate the trading volume and price of a cryptocurrency utility token called HYDRO. On November 30, 2023, Kane pled guilty to all four counts (Doc. 132, Page 36).

### II. Relevant Factual History

Kane was the CEO and controlling shareholder of Hydrogen Technology, a financial technology company he co-founded with his twin brother (Doc. 53, Page 8).  In early 2018, Appellant Kane and

his company created approximately 11 billion HYDRO tokens on the Ethereum blockchain to use as tokens for the firm's financial software and app development platform (Doc. 53, Pages 3–4). Kane distributed a portion of these tokens to himself, his brother, and approved developers while retaining a significant percentage under company control.

Hydrogen Technology marketed HYDRO as a "utility token" designed for use within a blockchain-based financial ecosystem (Doc. 53, Page 3). HYDRO was distributed through an airdrop to thousands of users as part of an effort to decentralize the network (Doc. 53, Page 4). HYDRO was designed to allow app developers to use the company's app development platform seamlessly (Doc. 53, Page 6). HYDRO tokens were utility tokens that would be used by businesses and consumers within a set of blockchain-based protocols (Doc. 53, Page 2).

The government introduced communications in which Appellant mentioned Hydrogen Technology's "long term strategy" - namely, that "anyone using the Hydro API will need to use or stake the HYDRO [coin]" (Doc. 166, Exh. B, Pages 6–7). In response to concerns over fluctuation in HYDRO's price, Appellant assured his

interlocutors that HYDRO was a utility token – that is, that HYDRO had a function: rather than being a security for speculation or investment, it was a currency for the company's ecosystem, in which the clients use the tokens for practical purposes (Doc. 166, Exh. B, Pages 11, 15). See also (Doc. 166, Exh. B, Page 13) ("it's a utility ecosystem").

## III. The Defendant's Conduct

After releasing the HYDRO token, Hydrogen Technology engaged Moonwalkers Trading Limited, a firm specializing in cryptocurrency market-making (Doc. 166, Page 3–4). Moonwalkers deployed a high-frequency trading bot that placed orders and trades on the Bittrex exchange between October 2018 and April 2019 (Doc. 166, Page 4). The government contends that these trades created the illusion of demand, inducing real investors to purchase HYDRO at artificially inflated prices. The government claimed that Appellant was aware of trades they claimed were being executed (Doc. 166, Page 4). HYDRO remained publicly tradable after the alleged manipulation period, and so it has not been established whether its price fluctuations were influenced by broader market conditions rather than deliberate fraud (Doc. 53, Page 6).

6

## STANDARDS OF REVIEW

When considering an enhancement, this Court reviews the district court's factual findings for clear error and the application of those findings *de novo. United States v. Perkins*, 787 F.3d 1329, 1341 (11th Cir. 2015). An error in the district courts' calculation of the defendant's guideline range merits reversal. *United States v. Barner*, 572 F.3d 1239, 1247 (11th Cir. 2009).

This Court reviews *de novo* whether an instrument or enterprise qualifies as an "investment contract" under the *Howey* test. *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1198-99 (11th Cir. 1999). The application of the *Howey* factors to the facts of a case is a question of law; the court reviews questions of law *de novo. First Options of Chicago Inc. v. Kaplan,* 115 S.Ct. 1920, 1926 (1995).

A guilty plea does not waive appellate review of whether the facts alleged and admitted could constitutionally be prosecuted. *United States v. St. Hubert*, 909 F.3d 335, 345–46 (11th Cir. 2018).

## SUMMARY OF THE ARGUMENT

The district court erred in its legal conclusion at sentencing that HYDRO constituted a security under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). The district court compounded its error in accepting

7

the guilty plea on the remaining three counts, all of which were based upon the faulty premise that a utility crypto coin can be considered a security for the purposes of federal securities fraud. Although the Appellant pled guilty to the indictment, Appellant challenged the legal basis of the indictment in a substantial motion to dismiss, which the district court denied. A guilty plea does not bar a defendant from challenging whether the conduct admitted constituted a crime, and thus, whether the government had any right to prosecute the defendant.

The government did not show that Appellant engaged in securities fraud, because Appellant's actions did not implicate any security: the HYDRO utility token that was the crux of the government's securities case was not a security. The HYDRO token did not meet the *Howey* test: (1) an investment of money, (2) in a common enterprise, (3) with an expectation of profits derived from the entrepreneurial or managerial efforts of others. Purchasers of HYDRO did not invest in a common enterprise with an expectation of profits derived from the managerial efforts of others; indeed, in many cases, the owners of the tokens did not even invest any money.

8

Instead, HYDRO functioned as a utility token designed for use within the Hydrogen ecosystem, facilitating transactions rather than serving as an investment vehicle. The government's theory of the case mischaracterized the economic reality of HYDRO transactions and failed to account for its decentralized nature and intended purpose.

There was no legal basis for the convictions that were predicated on the government's theory that HYDRO was a security, and that its market activity constituted securities fraud. If HYDRO was not a security, then a third party's sale of the coin cannot support securities fraud charges, and the wire fraud convictions, relying as they do upon the existence of an underlying securities fraud scheme, must necessarily fail. Without a valid securities fraud conviction, the wire fraud charges based on that alleged fraud could not have been sustained; the defendant, therefore, pleaded to charges that were not crimes. Even assuming, *arguendo*, that HYDRO's classification was ambiguous, the rule of lenity requires that such ambiguity be resolved in favor of the defendant.

The district court further erred by applying sentencing enhancements for sophisticated means, obstruction, and a leadership role. The government failed to establish that Appellant

9

Kane personally engaged in, or directed, sophisticated fraudulent conduct. The trading activity at issue was carried out by an independent market-making firm named Moonwalkers Trading Limited. There is no evidence that Appellant devised or directed the use of any complex or deceptive trading mechanisms. Similarly, the leadership enhancement was improperly applied because the government did not show that Appellant exercised control over a fraudulent enterprise. The record does not support a conclusion that Appellant oversaw or managed a structured hierarchy of co-conspirators. Neither does the record support a finding that Appellant in any way knew about, much less caused, any delay or hindrance in the prosecution's efforts to build a case against Appellant. The improper application of these enhancements significantly increased Appellant's offense level, resulting in an improper sentencing augmentation.

Additionally, the government's loss calculation is speculative and improperly inflated. The district court's calculation attributed broad declines in HYDRO's value to Appellant without isolating the impact of the third-party trades at issue from broader market forces. The government failed to show that investors relied on fraudulent

10

information when purchasing HYDRO, a necessary element of proving actual loss. Moreover, the loss calculation improperly included all HYDRO trades without distinguishing between alleged fraudulent, and legitimate, transactions. The government also failed to account for offsetting gains by investors, resulting in an artificially high loss figure. The correct loss calculation should either be zero, as the government has not met its burden to prove actual loss, or no more than $33,000, as supported by expert analysis. The government improperly used Guidelines commentary as an independent basis to impose a gain-based enhancement where the text of the applicable guideline does not authorize such an enhancement.

## ARGUMENT

### I. THE INDICTMENT DID NOT STATE A BASIS FOR APPELLANT'S CONVICTION AND SENTENCE

A conviction cannot stand unless the conduct alleged constitutes a crime. As the Supreme Court reaffirmed in *Class v. United States*, a guilty plea does not bar a defendant from challenging whether the conduct admitted constituted a crime, and thus whether the government had any right constitutionally to prosecute the defendant. 138 S. Ct. 798 (2018). Where the government has no

11

lawful authority to punish a defendant for the conduct alleged, the conviction must be vacated. Id.; see also *Menna v. New York*, 423 U.S. 61, 62 (1975) (per curiam); *Blackledge v. Perry*, 417 U.S. 21, 30 (1974).

This Court has consistently applied that binding precedent. In *United States v. Peter*, this Court vacated a conviction entered on a guilty plea where, following an intervening decision, the conduct at issue was determined not to be criminal. 310 F.3d 709, 711–12 (11th Cir. 2002). The Court explained that "jurisdictional defects", including an indictment that fails to allege a criminal offense, are not waived by a guilty plea and require *vacatur*. Id. Likewise, in *United States v. St. Hubert*, the Court confirmed that a guilty plea does not waive appellate review of whether the facts alleged and admitted could constitutionally be prosecuted. 909 F.3d 335, 345–46 (11th Cir. 2018).

The foregoing authorities converge on a single rule: A guilty plea does not insulate a conviction from appellate review when the conduct alleged and admitted does not, as a matter of law, constitute a federal crime. *See Peter*, 310 F.3d at 711–12.

In the present case, the indictment charged Appellant Kane with conspiracy to commit securities fraud and related offenses, all premised on the assertion that the HYDRO token his company developed constituted a "security" under federal law. Yet, as shown below, HYDRO was a decentralized utility token, not an investment contract under the test set forth in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). The government's alleged facts demonstrate the absence of a common enterprise or of a reasonable expectation of profit derived from the managerial efforts of others - both essential elements under *Howey*. Without a valid securities fraud predicate, the wire fraud counts, dependent upon the securities fraud theory, also fail.

Just as in *Peter*, where the government's inability to establish mail fraud required *vacatur* of a RICO conspiracy conviction entered on a guilty plea, so too here the government's inability to establish securities fraud requires *vacatur* of all convictions. See *Peter*, 310 F.3d at 711–12. Where the conduct charged and admitted is not criminal as a matter of law, the conviction must be set aside.

### A.    The Government Failed To Establish That HYDRO Constituted a Security

The district court erred in accepting a plea to an indictment that did not state a crime. The district court should have granted the motion to dismiss the indictment because the digital asset in question, HYDRO, did not meet the definition of a security under the *Howey* test. See *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). Under *Howey,* an investment contract exists if there is (1) an investment of money, (2) in a common enterprise, (3) with an expectation of profits derived from the entrepreneurial or managerial efforts of others. Id.; see also *SEC v. Friendly Power Co. LLC*, 49 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999). The Indictment's conclusory allegations that HYDRO was an investment contract failed to provide the basis to support the three requirements of *Howey,* (Doc. 3, Page 3); instead, it was the duty of the district court to perform a detailed analysis showing how HYDRO was determined to be an investment contract. See, e.g., the analysis performed by this Court in *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 755-758 (11th Cir. 2007).

The government's allegations failed to show that HYDRO purchasers reasonably expected to profit based on the managerial

14

efforts of Michael Kane or his co-defendant, Shane Hampton. Unlike traditional investment schemes where investors rely on managerial expertise, HYDRO was a tool, not a contract: it functioned as a utility for securing API data and facilitating transactions within the Hydrogen corporation's ecosystem. (Doc. 53, Page 6) (noting HYDRO's utility and distinction from an investment vehicle). The government's theory rested on a fundamental mischaracterization of the economic reality of HYDRO transactions, failing to establish that buyers invested in a common enterprise expecting profits primarily from the defendants' managerial efforts. See *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852-58 (1975).

    1.    <u>The Government Failed To Demonstrate a Common Enterprise That Satisfies The *Howey* Test</u>

The government did not adequately allege the existence of a "common enterprise," a necessary element under the *Howey* test to establish an investment contract. This Court has interpreted *Howey* to mean that a common enterprise exists where "the fortunes of the investor are interwoven with and dependent on the efforts and success of those seeking the investment or of third parties." *Villeneuve v. Advanced Business Concepts Corp.*, 698 F.2d 1121,

1124 (11th Cir. 1983), aff'd en banc, 730 F.2d 1403 (11th Cir. 1984), and "the requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the [promoter]." *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir. 1974) (Doc. 53, Page 19).

The guilty plea should be vacated because the indictment in which it is based lacks any factual allegations that HYDRO purchasers' financial outcomes were linked to the success or failure of Hydrogen Technology. The indictment failed to allege that HYDRO purchasers were promised a share of profits, had any reasonable expectation of receiving one, or that Hydrogen Technology pooled funds in a way that would create a common enterprise (Doc. 53, Pages 19-20). The indictment also does not allege that HYDRO purchasers knew whether they were buying from Hydrogen or from third-party holders trading the asset on secondary markets (Doc. 53, Page 20). Because the government neither alleged in the indictment, nor showed at sentencing, that developers purchasing HYDRO did so with an expectation of shared profits in a common enterprise, the district court could not accept Appellant's plea and should instead have granted his motion to dismiss.

16

The Supreme Court's decision in *Howey* holds that the government *must* prove the existence of a common enterprise in order for a stake in that enterprise to be regulated as a security. In *Howey*, investors purchased small tracts of land that were not viable as independent investments but gained value only when managed collectively by a third party. The Court noted that the investors had "no desire to occupy the land or to develop it themselves; they [were] attracted solely by the prospects of a return on their investment" and that "a common enterprise managed by respondents or third parties with adequate personnel and equipment [was] therefore essential if the investors [were] to achieve their paramount aim of a return on their investments." *Howey*, 328 U.S. at 299-300 (Doc. 53, Page 20).

HYDRO's structure bears no resemblance to the scheme in *Howey*. HYDRO purchasers were never led to believe that their money would be used to invest in or develop any future product or common enterprise. Those who purchased HYDRO on the open market had no reason to believe that their purchases were funding Hydrogen's operations (Doc. 53, Pages 20-21). Further, Hydrogen took specific steps to decentralize HYDRO, including distributing it through airdrops and bounty programs to developers, not investors,

17

to encourage adoption and use rather than speculation (Doc. 53, Page 21). These measures further undercut the government's claim that HYDRO purchasers' financial fates were tied to Hydrogen's managerial success (Doc. 53, Pages 21-22).

HYDRO *was not a company run by a manager for profit: it was instead a token that had use, like any currency.* A company that chooses to purchase from a Chinese factory will buy the yuan. One that chooses to purchase wheat from an American granary will buy the dollar. One that chooses to purchase ham from an Italian farm will buy the euro. And one that wished to engage in the Hydrogen Technology app-design platform would purchase HYDRO.

The HYDRO coin was open-source and decentralized, (Doc. 166, Exh. B., Page 17), rather than being managed for its price. The government relies upon a Hydrogen Technology employee for testimony (from co-defendant's trial) that HYDRO investors bought HYDRO for its value; that testimony was speculative and the objection was incorrectly overruled. See (Doc. 166, Page 3; *Exh. A, Pages 16-17*) (Note: Exhibit A here, attached to the Government's Sentencing Memo, refers to Gov. Ex 1 at the trial of Appellant's co-defendant).

The government ignores that Hydrogen Technology created an entire financial technology platform, including an ecosystem for app design (Doc. 53, Page 2). The platform was still in use at Fortune 500 companies at the time this case was being adjudicated in the district court (Doc. 53, Page 2, fn. 2). Hydrogen Technology was making millions each year in revenue at the time the company created a blockchain-based currency to be used as a utility on its app-building platform (Doc. 53, Page 2). App makers continued to use Hydrogen's app-building platform at the time this case's record was being made (Doc. 53, Page 2, fn. 4).

Hydrogen Technology designed the HYDRO token for use on that very platform, rather than as an instrument of investment: app makers could use HYDRO as a currency – for example, to simplify the creation of smart contracts within the Hydrogen API (the interface through which different applications communicate with one another). (Doc. 53, Page 3, fn. 5). HYDRO was a functional currency: it had purpose; it was integrated with the company's platform to enhance document security, to facilitate transactions, and to keep transparent ledgers on the blockchain (Doc. 53, Page 4). A utility token like HYDRO is a currency designed to make transactions more

transparent and less costly on a particular app – not unlike if a transportation and delivery company like Uber were to design an "Uber Cash" option to allow customers to make transactions within the Uber and Uber Eats network – or, offline, if an arcade were to use physical tokens as a currency to access their games on the premises (Doc. 53, Page 4).

A utility token, then, may give its owner access to aspects of a platform, but does not confer shares of the platform or the company. The token allows its owner to make transactions within the platform: it is a currency valid within the narrow walls of a particular app or system, as if Walt Disney were to issue "Disney Dollars" to be used on its apps (like ESPN or Disney+) or in its parks in the United States or in other countries. For this reason, Hydrogen Technology gave away its tokens for free to developers – not as a device for price manipulation, but as an incentive to encourage those developers to work and design within the Hydrogen ecosystem.

Additionally, the indictment does not allege that Hydrogen's business model depended on the financial success of HYDRO, or that Hydrogen retained ongoing control over its value (Doc. 53, Page 22).

The government admits that Appellant claimed publicly that the

20

HYDRO tokens were utility tokens that would be used by businesses and consumers within a set of blockchain-based protocols (Doc. 166, Page 2). Appellant's own messages support this reading. He mentioned Hydrogen Technology's "long term strategy" (Doc. 166, Exh. B., Page 6), that "anyone using the Hydro API will need to use or stake the HYDRO [coin]" (Doc. 166, Exh. B., Page 7). In response to concerns over fluctuation in HYDRO's price, Appellant assured his interlocutors that HYDRO was a utility token, (Doc. 166, Exh. B., Page 11) – that is, that HYDRO had a function, rather than being a security for speculation or investment; it was a currency for the company's ecosystem, in which the end users use the tokens for practical purposes (Doc. 166, Exh. B., Page 15). See also, (Doc. 166, Exh. B., Page 13) ("it's a utility ecosystem").

2. <u>The Government Failed To Demonstrate a Reasonable Expectation Of Profit From Others' Work To Satisfy The *Howey* Test</u>

To qualify as security under *Howey*, an investment contract must involve "a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *United Housing*, 421 U.S. at 852. Profits in this context are typically understood as "capital appreciation resulting from the development of the initial

investment... or participation in earnings resulting from the use of investors' funds", Id., rather than from the investor's own use of the asset. See: Doc. 53, Pages 22-23. When a purchaser's motivation is to use or consume the item rather than to seek financial returns, the securities laws do not apply.

For example, in *Villeneuve v. Advanced Business Concepts Corp.,* 730 F.2d 1403 (11th Cir 1984), this Court, sitting *en banc,* determined that an area purchaser agreement did not constitute a security because the plaintiff was expected to interact with the business: his efforts were to be part of the business, and therefore his expectations of profit did not derive solely from outside management, but rather from his own active engagement with the enterprise. The government did not show at sentencing any facts supporting that HYDRO purchasers had a reasonable expectation of profit tied to the entrepreneurial or management efforts of the managers of Hydrogen Technology. There was no evidence presented from which the district court at sentencing could have determined HYDRO was marketed to induce purchasers about potential profits (Doc. 130). Indeed, the indictment fails to specify how HYDRO was marketed, what representations, if any, were made to purchasers

about its potential for profit, or how any such expectation would be justified (Doc. 53, Pages 23-24).

Further, the record demonstrates that Hydrogen did not promote HYDRO as a profit-making investment. The company actively avoided engaging in discussions about trading or speculative value in its communications, as reflected in a statement from Appellant's co-defendant: "We try to not get involved in any talks involving trading on our telegram or social media" (Doc. 53, Pages 24-25). Hydrogen Technology took affirmative steps to discourage speculation and to ensure that HYDRO functioned as a utility token rather than an investment vehicle. This included marketing HYDRO as a means to access blockchain services, rather than as an appreciating asset (Doc. 53, Pages 25).

Hydrogen Technology implemented a decentralization plan that encouraged developers, not passive investors, to participate in the ecosystem and to use HYDRO for its function (Doc. 53, Pages 25-26). The company distributed a significant portion of HYDRO through airdrops and bounty programs rather than sales, reinforcing that it was intended for use rather than for financial speculation (Doc. 53, Page 26). As a result, many recipients obtained HYDRO at no cost

23

and had no financial commitment to its potential appreciation (Doc. 53, Pages 26-27).

Moreover, Hydrogen Technology did not exercise managerial control over HYDRO's value once it entered circulation. The platform's protocols and blockchain ecosystem were developed with open-source code, meaning their success or failure depended on community participation rather than on the efforts of a manager or an entrepreneur (Doc. 53, Page 27). The company's blockchain and its applications continue to operate without Hydrogen's involvement precisely because HYDRO's value was *not* dependent on the company's managerial or entrepreneurial efforts (Doc. 53, Pages 27-28).

To be sure, the mere fact that HYDRO was tradable on secondary markets does not convert it into a security. The existence of a secondary market does not necessarily create an expectation of profits under *Howey*. Instead, what matters is whether purchasers were led to believe that their returns would be driven by the company's managerial efforts (Doc. 53, Page 28). The government has not alleged any facts demonstrating such a connection.

In *SEC v. Ripple Labs, Inc.*, the Southern District of New York granted partial summary judgment in favor of the defendant, holding that those who bought the defendant's crypto token on digital asset exchanges did not necessarily have an expectation that the money raised from the sale of the companies digital token on public digital asset exchanges would be invested to improve the crypto token's ecosystem, or otherwise make improvements that would increase the value of crypto token. 682 F. Supp. 3d. 308, 329 (S.D.N.Y 2024). The Southern District of New York held that purchasers of the defendant's crypto token on open digital asset exchanges were not necessarily purchasing from the defendant's company, or purchasing pursuant to a definitive contract, and that therefore the company's offer of the crypto token did not constitute an offer or sale of an investment contract under *Howey*. 682 F. Supp. 3d. at 330.  The *Ripple* court emphasized that the sales of the company crypto token on exchanges did not involve the requisite investment contract characteristics, finding that the nature of the transaction must be examined in totality. 682 F. Supp. 3d. at 328-330.

The Southern District cited an old principle to justify its holding: "anyone who buys or sells a horse or an automobile hopes

25

to realize a profitable 'investment'. But the expected return is not contingent upon the continuing efforts of another." *SEC v. C.M. Joiner Leasing Corp,* 320 U.S. 344, 348 (1943). The *Ripple* court reasoned that the *Howey* test was not met for crypto coins sold on an open exchange, because those who purchased the company's coins could not reasonably expect that the company's coin would yield a profit solely on the managerial efforts of the company.

The HYDRO coin in the present case resembled the crypto token in the *Ripple* case to the extent that those who purchased HYDRO could not be said to have been purchasing the token expecting a return from the managerial or entrepreneurial efforts of the company is issuing the token. HYDRO was instead a currency with a use rather than a security; HYDRO was used for the flexibility and convenience it brought developers who designed on Hydrogen Technology's products. See: I.A.1, *supra.* As Appellant stated in texts to interested parties, (Doc. 166, Exh. B, Page 13), HYDRO was a utility, a digital token to be used for developers to work within the company's ecosystem.

Were Hydrogen Technology, the company designing HYDRO, to sell shares, those shares would be securities; but HYDRO the coin

26

was simply a blockchain system to be used for its properties: security, transparency, reliability, compatibility, and convenience. If HYDRO were widely adopted, its adoption could certainly increase the value of the parent company, and shares of that company would be regulated as securities. But HYDRO itself was no more a security than the Robux used today by videogame enthusiasts to navigate the various games in the Roblox ecosystem.

HYDRO gave its owner certain privileges – storage rights, computing power, access to apps (Doc. 53, Pages 4-5) – but just as a token in an arcade is not a share of the arcade, but rather a means to access the arcade consoles, the token HYDRO was not itself a security or a share in Hydrogen Technology.

The government failed to demonstrate that the HYDRO coin was a security under the *Howey* test. The government failed to demonstrate either that a common enterprise existed with shared financial interests in the HYDRO utility token, or that purchasers of the utility token could reasonably expect the token's value to be derivative solely from the managerial efforts of the company producing the token.

27

3.  <u>Where The Hydro Coins Were Not Purchased, The Government Failed To Demonstrate The Investment Requirement Of The First Prong Of The *Howey* Test</u>

Many owners of the HYDRO coins obtained them without purchasing them, *see,* Doc. 53, Pages 26-27 (many recipients obtained HYDRO at no cost and had no financial commitment to its potential appreciation). With regard to those owners, the first prong of the *Howey* test, which requires an investment, was also not satisfied.

Because the government failed to demonstrate two, and in many cases none of the three, essential prongs of the three-prong *Howey* test, the trial court erred in accepting the plea for securities fraud against Appellant.

**B.   The District Court's Erroneous Treatment Of HYDRO As a Security Violates The Rule Of Lenity**

Even assuming, *arguendo*, that HYDRO's classification was ambiguous, such ambiguity must be resolved in favor of the defendant under the rule of lenity. See *United States v. Santos*, 553 U.S. 507, 514 (2008) ("The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them."). See also: *United States v. Gradwell*, 243 U.S. 476, 485 (1917). Justice

28

Scalia, writing for the Court in *Santos*, notes that "this venerable rule" of lenity is meant to vindicate "the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to a punishment that is not clearly prescribed." 553 U.S. at 514. The uncertainty surrounding digital assets and their classification under securities laws, as evidenced by the evolving case law and regulatory guidance, militates against treating HYDRO as a security for the purpose of criminal liability. See (Doc. 53, Pages 13-14) (discussing the unsettled nature of cryptocurrency regulation at the time of the alleged conduct). Appellant's motion to dismiss (Doc. 53) should have been granted because the indictment did not state an unambiguous crime.

The government's broad and unsupported assertion that HYDRO was a security, without clear statutory or judicial guidance, raises significant due process concerns. A plea based on an ambiguous legal theory cannot stand. See *McBoyle v. United States*, 283 U.S. 25, 27 (1931) (holding that defendants must have "fair warning" of conduct constituting a crime). By not dismissing Count One of the indictment, and accepting Appellant's plea on that count,

29

the district court impermissibly extended the reach of securities laws beyond their intended scope, warranting reversal. Because the government failed to establish that HYDRO was a security under *Howey*, the district court's sentence under Count One was erroneous. The sentence is contrary to legal precedent, disregards economic realities, and violates the rule of lenity. Accordingly, this Court should reverse the district court's sentence as to Count One.

## II. THE WIRE FRAUD CHARGES RELY ON THE ERRONEOUS SECURITY FRAUD CHARGE IN COUNT ONE AND FAIL TO STATE A CRIME

### A. Legal Framework For Dependent Criminal Counts

#### 1. The Derivative Nature Of Wire Fraud Based On Securities Fraud

Wire fraud, as codified in 18 U.S.C. § 1343, requires the government to prove a scheme to defraud and the use of interstate wires to further that scheme. That is, the wire fraud statute, 18 U.S.C. § 1343, by requiring a "scheme or artifice to defraud", presupposes the existence of an independently fraudulent scheme. When the government's theory of fraud is entirely dependent on a separate count, the wire fraud charge cannot be sustained if that legal theory fails.

This Court explained wire fraud:

> The law in question here is the wire-fraud statute, which makes criminal any "scheme or artifice to defraud."[3]18 U.S.C. § 1343… a "scheme to defraud", as that phrase is used in the wire-fraud statute, refers only to those schemes in which a defendant lies about the nature of the bargain itself. That lie can take two primary forms: the defendant might lie about the price (*e.g.*, if he promises that a good costs $10 when it in fact costs $20) or he might lie about the characteristics of the good (*e.g.*, if he promises that a gemstone is a diamond when it is in fact a cubic zirconium). In each case, the defendant has lied about the nature of the bargain and thus in both cases the defendant has committed wire fraud. But if a defendant lies about something else—*e.g.*, if he says that he is the long-lost cousin of a prospective buyer—then he has not lied about the nature of the bargain, has not "schemed to defraud," and cannot be convicted of wire fraud on the basis of that lie alone.

*United States v. Takhalov*, 827 F.3d 1307, 1313-14 (11th Cir. 2016).

In *Takhalov*, this Court took pains to distinguish an actual scheme to defraud from other actions that might induce a buyer to make a purchase. In the present case, no allegation has been made that Appellant or his company lied in any transaction about the price that the buyer would pay for the transaction. The only allegation of actual conduct against Appellant or his company rests exclusively on securities law's criminalization of what would otherwise never be criminal action. The only cause for asserting is jurisdiction over

31

Appellant in the case at bar rests on the incorrect assumption that HYDRO tokens were securities subject to federal jurisdiction.

Securities law, which criminalizes otherwise lawful conduct, was the sole basis for the wire fraud counts. So, when the securities claim fails, all that is left is otherwise lawful conduct: one company purchasing another company's product. When wire fraud charges are predicated solely on the transfer of proceeds obtained through an alleged securities fraud scheme, such charges are inherently derivative. They depend entirely on the existence of a legally cognizable fraud in the first instance.

The mere transfer of funds is inherently neutral conduct; it only takes on a criminal character if the transfer furthers a scheme that is itself independently fraudulent. Without an underlying scheme to defraud, these transfers are merely ordinary commercial transactions, and the government has no basis from which to allege any conduct that meets a central prong of the wire fraud statute.

Derivative counts cannot survive the failure of their predicate offense, not merely a matter of statutory interpretation, but also as a matter of fair notice and due process. Criminal statutes must provide clear notice of what conduct is prohibited, and this notice

32

requirement is frustrated when derivative charges are sustained despite the failure of the predicate offense that gives them their criminal character.

When the government builds a theory of prosecution on a chain of dependencies, the failure of any essential link in that chain must result in the collapse of dependent charges. To hold otherwise would transform derivative charges into independent offenses, expanding their reach beyond the clear intent of Congress and potentially encroaching on conduct that may be entirely lawful. The standard of review is particularly appropriate here, where the relationship between the counts is established by the four corners of the indictment itself, which this Court is as capable of interpreting as was the district court. The legal question of whether Counts 2-4 can survive if Count 1 fails does not involve factual determinations or credibility assessments that would warrant deference to the trial court's determinations.

The plain language of the indictment itself reflects the derivative relationship between the securities fraud conspiracy and the wire fraud counts. The government conceived of wire fraud not as a separate fraudulent enterprise, but as the mechanism for completing

33

and profiting from the alleged securities fraud scheme: the Indictment incorporates by reference the "Manner and Means" section of the security fraud count as the description of the scheme for the wire fraud counts, (Doc. 3, Page 14), and the "Purpose of the Scheme and Artifice" section included in the wire fraud counts mirrors precisely the "Purpose of the Conspiracy" described for the securities fraud count (Doc. 3, Page 5 and Pages 14-15).

If HYDRO tokens are not securities, then the alleged manipulation of their market price cannot constitute securities fraud. And if there were no securities fraud, then the subsequent wire transfers of profits cannot be characterized as fraudulent, as they would simply represent legitimate business transactions.

The specific Bitcoin transfers represented in Counts 3 and 4 of the Indictment demonstrate the derivative nature of the wire fraud charges. Count 3 alleges a February 10, 2019, transfer of 2.5 Bitcoin from Kane's account on Exchange-1 to a crypto wallet controlled by Wolvaardt "on behalf of Moonwalkers" (Doc. 3, Page 15). The indictment characterizes this transfer as payment for market manipulation services related to HYDRO tokens. If HYDRO tokens are not securities, however, this payment represents compensation

34

for lawful business activities, not the proceeds of fraud.

Similarly, Count 4 concerns a March 8, 2019, transfer of 2.3 Bitcoin (Doc. 3, Page 16). The transfer could only be fraudulent if Moonwalker's trades of HYDRO tokens constituted securities fraud. Without the securities fraud allegation, the transfer reflects a legitimate business expense.

The wire fraud statute requires a "scheme to defraud," but if HYDRO tokens are not securities, the activities described in the indictment, the selling of HYDRO tokens, do not constitute a violation of federal securities laws, and are not otherwise illegal. Consequently, the Bitcoin transfers alleged in Counts 3 and 4 lose their fraudulent character, as they merely represent payments for services that, absent securities law violations, would be lawful.

The district court sentenced Appellant Kane on an indictment that did not allege sufficient facts to prove a crime for any of the counts. For this reason, this Court should reverse.

## III. ERRONEOUS APPLICATION OF SENTENCING ENHANCEMENTS

The district court's application of sentencing enhancements under U.S.S.G. § 2B1.1(b)(10) for sophisticated means, U.S.S.G. §

3B1.1 for a leadership role, and U.S.S.G. § 3C1.1 for obstruction of justice was improper and unsupported by the record. These enhancements unjustly inflated Kane's offense level and resulted in an unwarranted sentencing increase. The erroneous leadership role enhancement also caused the district court to err by failing to apply a first-time offender reduction. The government failed to establish by a preponderance of the evidence that these enhancements were applicable to Kane's conduct. See: *United States v. Moran*, 778 F.3d 942, 973 (11th Cir. 2015) (holding that the government must establish by preponderance of the evidence the specific facts necessary for sentencing enhancement). Because the record does not support their application, the enhancements must be vacated.

### A.    Erroneous Sophisticated Means Enhancement

The sophisticated means enhancement applies only when the defendant personally engaged in or caused conduct that was "especially complex or intricate." U.S.S.G. § 2B1.1(b)(10), cmt. n.9(B). The Sentencing Commission amended this provision in 2015 to ensure that enhancements are based on a defendant's personal actions rather than the overall scheme of co-conspirators. See U.S.S.G. App. C, Amend. 792 (2015).

The record demonstrates that Kane did not perform much at all personally. He did not develop or direct Moonwalker's strategy of sales of the HYDRO utility token. He did not develop or employ any technologically intricate or deceptive mechanisms that would warrant this enhancement. He did not implement the trading strategy or the trading algorithms that carried out that strategy. The trading bot that the government claims constituted sophisticated means was designed, implemented, and executed by another party in another country: Tyler Ostern and Moonwalkers Trading Limited ("Moonwalkers"), an entity that Kane did not form, control, or direct (Doc. 174, Page 14). Kane's role in the trading strategy that the government incorrectly claims is a securities fraud was limited to his being in the role of CEO at Hydrogen Technology. A completely separate company, under completely separate management, with its own internal trading strategies, was carrying on the trading that the government incorrectly has labeled securities fraud.

Appellant Kane did not engage in any deceptive structuring of transactions, creation of fictitious identities, or concealment of assets. The record does not contain evidence that Kane employed shell corporations, offshore accounts, or encrypted communications

37

to mask the conduct at issue. In fact, the record contains nothing that the district court could have relied upon to enhance Appellant's sentence for "sophisticated means".

Moonwalkers – a corporation separate from Appellant's corporation, and one completely outside of Appellant's control - openly marketed its trading services, and Appellant's involvement was limited to being CEO when another member of his firm hired Moonwalkers in an attempt to decentralize Hydrogen Technology's HYDRO utility (Doc. 174, Pages 13-14). While the government contends that Appellant became aware of Moonwalkers' volume manipulation after the contract was executed, (Doc. 174, Pages 15-17) that subsequent knowledge of an already existing strategy does not satisfy the requirement that the defendant "engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1(b)(10). Appellant's conduct is distinguishable from that of a defendant who actively devised or directed an intricate scheme (Doc. 174, Pages 14-15). The district court did not have sufficient evidence to find by a preponderance of the evidence that Appellant engaged in conduct constituting sophisticated means.

### B.    Erroneous Leadership Enhancement

The district court's application of a leadership role enhancement under U.S.S.G. § 3B1.1(a) was equally erroneous. To justify this enhancement, the government was required to prove but a preponderance of the evidence that Appellant was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a).

However, the government failed to present any evidence, much less a preponderance of evidence, sufficient to demonstrate that Appellant exercised the requisite control or decision-making authority over others involved in the alleged conspiracy. To receive a role-enhancement at sentencing, a defendant must have engaged in actual oversight of criminal activity. U.S.S.G. §3B1.1 cmt. n. 2. See also: *United States v. Valenzuela*, 635 F. App'x 582, 572 (11th Cir. 2015). The government's own evidence confirms that Moonwalkers was an independent entity that autonomously conducted trading activities, and there is no indication that Appellant directed or managed its operations (Doc. 174, Pages 15-17).

The record further demonstrates that Appellant did not recruit co-conspirators or dictate their actions. Unlike cases where the

39

enhancement has been properly applied, Appellant did not oversee a structured hierarchy, issue directives, or allocate responsibilities among subordinates (Doc. 174, Page 16). Rather, the evidence shows that Appellant Kane's role was limited to working as CEO when another member of his firm engaged Moonwalkers; Appellant neither engaged Moonwalkers nor directed its methodology or execution. (Doc. 53, Pages 9-10; Doc. 174, Pages 14-17). The leadership enhancement is inappropriate where, as here, the defendant's actions do not rise to the level of control or authority contemplated by the Guidelines (Doc. 174, Pages 16–17).

The district court erred in assigning the foregoing enhancements. The error significantly increased Appellant Kane's sentencing range, resulting in a disproportionately severe punishment. The erroneous enhancements pushed Kane's offense level higher than that of his co-defendants, despite the fact that he did not personally profit from the scheme, unlike others who earned substantial sums from HYDRO token sales (Doc. 174, Page 17). Furthermore, since Appellant was not a leader in a criminal enterprise, the district court further erred in denying him a reduction for being a first-time offender.

40

## C. **Erroneous Obstruction Of Justice Enhancement**

The district court's application of a two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1 constitutes error. The record reflects that the government failed to show by a preponderance of evidence both essential prongs required for this enhancement: (1) that Appellant willfully engaged in conduct with the specific intent to obstruct a criminal investigation, and (2) that such conduct actually resulted in a significant hindrance to the investigation or prosecution. The temporal disconnect between Appellant's alleged conduct during an SEC civil investigation and the initiation of criminal proceedings more than two years later precludes a finding that Appellant possessed the requisite *mens rea* or that his actions materially impeded the criminal case.

### 1.    Legal Standard

When considering a district court's imposition of an enhancement for obstruction of justice," this Court "review[s] the district court's factual findings for clear error and the application of the factual findings to the sentencing guidelines de novo." *United States v. Perkins*, 787 F.3d 1329, 1341 (11th Cir. 2015). "Unless it is harmless, an error in the district court's calculation of the applicable

41

guideline range warrants reversal." Id. (citing *United States v. Barner*, 572 F.3d 1239, 1247 (11th Cir. 2009)). The district court, in order to apply an obstruction enhancement, must find that the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1; *United States v. Guevara*, 894 F.3d 1301, 1311-13 (11th Cir. 2018).

For conduct that occurred prior to the criminal investigation, application note 1 to U.S.S.G. § 3C1.1 requires that "such conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." The Eleventh Circuit has emphasized that this enhancement encompasses both a *mens rea* requirement and a materiality element—the conduct must have "actually resulted in a significant hindrance to the investigation or prosecution." *Guevara*, 894 F.3d at 1311-13. The harm must be concrete: "the government must present evidence of what action it took that it would not have taken[,]" *United States v. Banks*, 347 F.3d 1266, 1271 (11th Cir. 2003) (citations omitted), or what result they were prevented from achieving.

42

## 2. Appellant Lacked The Specific Intent To Obstruct a Criminal Investigation

As outlined in Appellant's objections to the Pre-sentence Investigation Report (PSR), the conduct at issue, providing an altered Slack chat conversation to the SEC, occurred over two years before the government even initiated a criminal investigation (Doc. 153, Pages 14-15). This significant temporal gap defeats any inference that Appellant intended to obstruct a future criminal investigation that did not yet exist and could not have been reasonably anticipated.

The Eleventh Circuit's decision in *Guevara* is directly on point. There, the Court found that conduct occurring years before the criminal offense could not "necessarily [be] 'purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction' - particularly given that [defendant] did not commit the offense until years later." *Guevara*, 894 F.3d at 1312. Similarly, Appellant's conduct during the SEC civil investigation in 2020 cannot be deemed purposefully calculated to thwart a criminal investigation that did not commence until well after the civil investigation (Doc. 174, Pages 17-19).

43

### 3.    Appellant's Conduct Did Not Materially Hinder The Criminal Investigation Or Prosecution

Even if Appellant had the requisite intent to hinder his prosecution, the evidence cannot establish that his conduct "actually resulted in a significant hindrance to the investigation or prosecution." *Guevara*, 894 F.3d at 1311-13. As noted in Appellant's sentencing memorandum, the government obtained both the altered and the unaltered version of the chat from the SEC from the very beginning of their investigation (Doc. 174, Page 20). The government was fully aware of the alteration from the start and faced no impediment in using the unaltered chat as evidence. Therefore, no district court could rationally find, under any plausible reading of the evidence, that Appellant caused any impediment or delay whatsoever to the government's case.

This Court has repeatedly vacated obstruction enhancements where the government fails to demonstrate concrete, material harm to the investigation. See *United States v. Jeune*, No. 19-13018, 2021 WL 3716406, at *19 (11th Cir. Aug. 23, 2021) (vacating enhancement because the government did not establish, as a matter of fact, that the defendant significantly obstructed the official criminal

44

investigation: "Nevertheless, as our precedent demonstrates, they must still obstruct the forthcoming criminal investigation in some way."); *United States v. Howard*, 782 F. App'x 746, 751 (11th Cir. 2019) (vacating enhancement where there was no evidence as to how a false statement was material or impeded the investigation or prosecution: the prosecution must show "it fruitlessly spent investigation or prosecution resources due to [the defendant's] untruthfulness.").

Here, the government has not identified any specific action it was prevented from taking, or any evidence it was unable to obtain, due to Appellant's conduct. In fact, the government successfully prosecuted Appellant's co-defendants using the unaltered chat (Doc. 174, Page 20). As `this Court held in *United States v. Shriver*, when the government "failed to present evidence establishing that the investigation had been in any way hindered," an obstruction enhancement is inappropriate. 967 F.2d 572, 575 (11th Cir. 1992).

For the foregoing reasons, the district court's application of the obstruction of justice enhancement was erroneous as a matter of law. The government failed to prove by a preponderance of the evidence

45

that Appellant acted with the specific intent to obstruct a criminal investigation that did not yet exist, or that his conduct materially hindered the subsequent criminal investigation. Accordingly, this Court should vacate Appellant's sentence.

## IV.    ERRORS IN LOSS CALCULATION REQUIRE CORRECTION

A trial judge must make factual findings that support any losses that are proposed to enhance a defendant's sentence. *United States v. Renick*, 23 F.3d 1009, 1026 (11th Cir. 2001). This Court in *Renick* vacated in part a conviction because the sentencing judge did not determine the loss amount with precision. This Court's decision to vacate the sentence in *Renick* is consistent with precedent from other circuits. *See, e.g.*, *United States v. Schneider*, 930 F.2d 555 (7th Cir. 1991) (loss improperly calculated based on entire price of contract); *United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997) (error to base loss on total proceeds from Medicare practice). The District Court did not make the necessary factual findings to hold Appellant accountable to the last calculation the District Court used to determine Appellant's sentence.

The government's loss calculation in the case at bar is

46

improperly inflated, incorporating speculative and unsubstantiated amounts that result in an unfairly high offense level under the U.S. Sentencing Guidelines ("Guidelines"). The calculation fails to adhere to the standards set forth in U.S.S.G. § 2B1.1 and relevant Eleventh Circuit precedent, which require that losses be both reasonably foreseeable and directly attributable to the defendant's conduct. These errors must be corrected to ensure that Appellant Kane's sentence reflects only actual, provable loss.

### A.    Speculative Losses Are Impermissible

The loss amount attributed to Appellant Kane includes speculative declines in the value of HYDRO tokens. Those fluctuations in the value of the utility tokens were not due to Appellant's involvement, or even necessarily to the Moonwalker trades. The government relied on conjecture rather than evidence to propose the loss amount, and the trial court erred in accepting the arbitrary calculations. This Court has held that while district court may estimate loss, "it cannot speculate about the existence of facts and must base its estimate on reliable and specific evidence." *United States v. Stein*, 846 F.3d 1135, 1152 (11th Cir.), *cert. denied*, 583 US 1039 138 S.Ct. 556 (2017). Furthermore, the loss must reflect

47

"reasonably foreseeable pecuniary harm that resulted from the offense," not fluctuations caused by broader market forces. *Id.*

In *Stein*, this Court rejected the prosecution's claim that the defendant should be liable for 2,415 investors. The prosecution in *Stein*, as here, failed to show that investors relied upon the defendant's fraudulent information. 846 F.3d at 1153. The prosecution in *Stein*, as here, trotted out a handful of victim impact statements; this Court decided in *Stein* that such a showing was insufficient to demonstrate that the remaining thousands of investors also relied on the defendant's fraudulent information. 846 F.3d at 1154.

The cryptocurrency market is inherently volatile, and the decline in HYDRO token value could have been caused by numerous external factors, including market conditions and unrelated trading activity. The government has not isolated the impact of any action by Appellant Kane - or even by Moonwalkers - from these broader forces. The government's failure to do so violates the principle that a defendant may only be held accountable for losses that "resulted from the offense." *United States v. Sepulveda*, 115 F.3d 882, 890 (11th Cir. 1997).

48

The government grounds its loss calculation on two investors who lost "thousands of dollars" (Doc. 166, Page 7). But "thousands of dollars" in losses is orders of magnitude less than the seven-figures for which the government improperly imprisoned Appellant Kane.

The government cited *Maxwell v. United States*, 579 F.3d 1282 (11th Cir. 2009) for the proposition that a defendant's gain from a scheme can serve as a proxy for the victims' losses attributed to that scheme during the defendant's sentencing (Doc. 166, Page 7). The case is inapposite: *Maxwell* dealt with government contracts for Miami International Airport, where the "loss" would be the amount the government, and therefore the people, spent on fraudulent contracts. The government in *Maxwell* was not making an investment in a currency, and then perhaps mitigating its losses in the investment – or perhaps even making profit from the sale of that currency. In the present case, by contrast, those who purchased the currency did have an opportunity – indeed many opportunities – to mitigate their losses by selling HYDRO at any time during which they held the currency. They also had the opportunity to employ the currency in its actual intended use: as a token to access the Hydrogen Technology app-design ecosystem.

49

Here, Hydrogen Technology's profits are not in any way a conceivable proxy for the losses that purchasers of the HYDRO currency suffered. Victim losses must be assessed fairly and exactly; to fail to do so is to deny Appellant basic protections of process.

The government claims that co-conspirators may be sentenced differently from one another, even if convicted for the same offense (Doc. 166, Page 11). The government makes this argument to justify holding Appellant to a victim-loss approaching $1.5 million. It is true that a defendant may be sentenced differently from his co-conspirator. Sentences may vary, within reason, to be sure. But the *facts* may not. It is a violation of basic intuitions of fair process to allow the government to fabricate a loss number that is substantially different for co-conspirators convicted of the same crime.

### B.    Lack Of Proof Of Investor Reliance

The government did not demonstrate that investors relied on fraudulent volume data when purchasing HYDRO, which is a necessary component of establishing loss. The government "must show that investors relied on fraudulent information" to prove that loss was caused by the offense conduct. *Stein,* 846 F.3d at 1153. The government cannot merely argue that all investors who purchased

50

HYDRO during the relevant period were misled; rather, "evidence of reliance must be shown for each investor." Id. at 1154.

The government's assertion that "thousands" of investors were victims (Doc. 166, Page 14) is unsubstantiated. The error is compounded by the dishonesty of those who claimed victim status: some of the victims the government used to determine the extent of Appellant's liability lied about their losses (Doc. 288, Pages 6-7). For example, "Mr. Aaron self-claimed HYDRO losses of a hundred thousand dollars; when the government actually looked at it, they were closer to $2,800." Id. at Pages 10, 23-25. The loss figures were not submitted` under oath, Id. at Page, 7, yet Appellant was sentenced to years in prison based on these unreliable claims.

This Court has rejected similarly ambiguous loss calculations in the past. See, e.g., *Renick*, 273 F.3d at 1026 (finding that allegations of fraud alone do not suffice to establish loss); *United States v. Grant*, 211 F. App'x 889, 896-97 (11th Cir. 2006) (rejecting assumption that all investors relied on fraudulent statements). This Court should follow its precedent and reject the unsupported loss calculations in the case at bar.

51

## C.    Offsetting Gains Must Be Considered

The government further failed to account for offsetting gains made by investors, resulting in an inflated loss figure. The Guidelines require that loss be reduced by "the value of any money or property returned to the victim before the offense was detected." U.S.S.G. § 2B1.1, Application Note 3(E). Failure to deduct gains renders the loss calculation legally erroneous. This principle applies here, where investors who sold HYDRO at a profit during the period in question should not be counted as victims for loss purposes.

## D.    The Government's Justification For Using Gain Instead Of Loss Is Legally Flawed

The government's reliance on commentary to the United States Sentencing Guidelines to support a sentencing enhancement based on purported "gain" is improper. This Court should hold the district court to this Court's previous clear precedent, one that rejects the use of the Guidelines commentary as an independent basis to impose a gain-based enhancement where the text of the applicable guideline does not authorize such an enhancement (See Doc. 286, Page 20).

This Court has made clear that agency commentary cannot expand the text of a guideline. In *United States v. Dupree*, 57 F.4th

52

1269 (11th Cir. 2023) (en banc), this Court emphasized that commentary to the Guidelines may help interpret a Sentencing Guideline but cannot add substantively to it.

Commentary, like an agency's interpretation of its regulations, was never entitled to deference unless the Guideline itself is genuinely ambiguous; even then, courts would have to first exhaust all traditional tools of construction before deferring to commentary. Id. at 1278–79. Now, after the abrogation of 'Chevron deference' in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), a district court *a fortiori* has no excuse for granting deference to the commentary of an unelected agency when interpreting sentencing guidelines.

Here, as in *Dupree*, there is no ambiguity in the relevant guideline, so this Court would need to vacate Appellant's sentence whether it came before or after *Raimondo*. The clear, unambiguous text of Section 2B1.1 of the Guidelines provides for sentencing enhancements based on "loss," not "gain." The plain text of § 2B1.1(b) defines adjustments by "loss" amounts, and Application Note 3(A)

defines "loss" as "the greater of actual loss or intended loss."[1] Nowhere does the text of § 2B1.1 authorize or contemplate a gain-based enhancement. Thus, under *Dupree*, commentary purporting to allow an enhancement based on gain cannot rewrite the plain terms of § 2B1.1.

The Court reaffirmed this principle in *United States v. Smith*, holding that where a Guideline's text is unambiguous, it is "unnecessary to consider, much less defer to, the commentary." 2025 WL 900016, at *2 (11th Cir. Mar. 24, 2025) (citing *Dupree*, 57 F.4th at 1278). In *Smith*, the Court rejected the government's attempt to rely on commentary to expand the definition of a "controlled

---

[1] Because the government introduced no evidence concerning actual loss, the government argues that the Court should substitute gain as a proxy for loss (Doc. 166, Page 7). It is contrary to this Court's precedent concerning the interpretation of the sentencing guidelines, and the lack of authority of the guidelines' commentary, to use gain as a substitute for loss. But it is also contrary to the Court's precedent on other grounds: this Court has repeatedly rejected using gain to calculate a defendant's sentence where loss can be reasonably estimated. *United States v. Bracciale*, 374 F.3d 998, 1004 (11th Cir. 2004) (reversing a district court that defaulted to gain instead of conducting a proper loss analysis). The loss in this case can indeed be calculated, and has been calculated, by the expert report of Jeremy Cusimano, the only expert to provide a reliable methodology in this case for calculating loss. Mr. Cusimano calculated the loss figure to be at most $33,000 (Doc. 191, Page 76:15).

54

substance offense," emphasizing that the text controls where it is clear. Id. The same reasoning applies here: § 2B1.1's unambiguous reference to "loss" forecloses the government's attempt to substitute gain through commentary.

Moreover, as set forth in Appellant's Sentencing Memorandum, Doc. 174, this Court requires the government to prove "loss" by a preponderance of the evidence and prohibits speculation or reliance on unsupported estimates. See *United States v. Stein*, 846 F.3d 1135, 1152. The Court bases loss findings on reliable and specific evidence, not on speculation about the existence of facts permitting a higher sentence. See *Stein*, supra. Where actual loss is not proved, no enhancement is warranted. See *United States v. Tatum*, 138 F.3d 1344, 1347 (11th Cir. 1998) ("If on remand the district court finds that there is no actual loss and no intended loss, then there should be no enhancement of the base offense level on account of the amount of the losses"); *United States v. Renick*, 273 F.3d 1009, 1026–27 (11th Cir. 2001).

This Court has held that a finding of no loss is not unusual, even in fraud cases. See *Renick*, 273 F.3d at 1027; *United States v. Bazantes*, 978 F.3d 1227, 1249–50 (11th Cir. 2020) (government

55

failed to prove any loss). Where there is no proven actual or intended loss, the Guidelines prohibit any enhancement based on speculative measures such as gain.

Further, in *United States v. Horn*, 129 F.4th 1275 (11th Cir. 2025), this Court rejected the notion that a defendant's gain could substitute for a finding of loss, affirming that sentencing enhancements must be grounded in proven - not presumed - economic harm. Id. at 1289–90. Thus, any reliance on gain rather than loss is inconsistent both with the text of § 2B1.1 and this Court's precedent.

56

## **CONCLUSION**

For the reasons stated above, Appellant Michael Ross Kane requests that the sentence be vacated and the case dismissed because the charges did not constitute a crime that could support a plea and sentence. In the alternative, Appellant requests that the erroneous sentence be vacated and remanded with instructions.

Dated: April 21, 2025    Respectfully submitted,

O'DONNELL CHRISTOPHER LLP
P.O. Box 172538
Miami, FL 33017
Tel: 305.640.8958
Email: sodonnell@
odonnellchristopher.com

/s/ *Sonia E. O'Donnell*
SONIA E. O'DONNELL
Florida Bar No. 250643

/s/ *Robert A. O'Donnell*
ROBERT A. O'DONNELL

## **CERTIFICATE OF COMPLIANCE**

The undersigned attorney hereby certifies that this brief complies with the type-volume limitations of Fed.R.App.P. 32(a)(7)(B) and Eleventh Circuit Rule 28-1 because, excluding the parts of the brief exempted by Fed.R.App.P. 32(f), this brief contains 10,886 words.

The undersigned attorney further certifies that this brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type-style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally space typeface using Microsoft Office 365 in Bookman Old Style 14-point font.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 21, 2025, a copy of the foregoing was filed electronically with the Clerk of Court using the CM–ECF system and served via CM/ECF on all registered parties, including:

Daniel Matzkin, Esq.
Daniel.matzkin@usdoj.gov
Chief, Appellate Division
U.S. Attorney's Office
99 N.E. 4th Street, Ste 500
Miami, FL 33132

Respectfully submitted,

O'DONNELL CHRISTOPHER LLP
P.O. Box 172538
Miami, FL 33017
Tel: 305.640.8958
Email: sodonnell@
odonnellchristopher.com

/s/ *Sonia E. O'Donnell*
SONIA E. O'DONNELL
Florida Bar No. 250643

/s/ *Robert A. O'Donnell*
ROBERT A. O'DONNELL
Florida Bar No. 1011567

59